Good morning, Your Honor. It pleases the Court, Girish Srin, on behalf of Suntok Singh. Good morning, counsel. This issue, I'm going to start with credibility. The immigration judge and the BIA obviously had no reason to find my client basically inconsistent or implausible. They did not read any of his corroborative evidence. They did not read his medical testimony provided. They did not read his affidavits. In fact, they didn't even read the country conditions that clearly indicated that the Indian police is famous or infamous basically for extorting money and going after individuals and citizens who they feel they can extort money and for summary punishment. He was arrested three times. There is no dispute about that. He was tortured. He was illegally detained. The questions of whether it was a prick or whether it went through his leg, he at all times stated he received a cut. And the medical testimony indicates he had numerous stitches. The immigration judge no once relied on any of the Department of State's reports or at any time relied on any of the evidence. The reasons stated for his adverse credibility are basically minor and don't show substantial evidence. And we feel that it compels his decision to be overturned as well as the BIA. Ginsburg. One of the things, the BIA added to the reasons given by the IJ that he left with a valid passport, but when did he get the passport? I'm unclear. I think the BIA said he left with a passport and they felt if an individual who leaves with a passport couldn't have been tortured or arrested. I don't know how they came to that conclusion. There was no evidence on that. It states he first got his passport, I believe, in 82, then he renewed it. But what is unclear, which the BIA didn't pick up, is he escaped to Dubai. And when he went to Dubai, he obtained his visa through an agent. I think the word agent is used synonymously over here with smuggler. I may be mistaken, but that was my understanding. The real question over here is the Indian government would allow him to go. They never prosecuted him. They had no interest in him. The Indian police had an interest in him because of his family's association with Sikh militants and separatists. He was an easy and susceptible target for official extortion. This is a clear case of mixed motive as well as imputed political opinion. If we agree with you that the adverse credibility finding is flawed, then what happens? We send it back to the IJ with directions to reconsider the asylum application, taking everything Mr. Singh says is true, or is there some other thing we ought to do? Well, I hope, yeah, if you do find him credible and that the decision should be vacated, then you should also find he demonstrated past persecution, a well-founded fear of future persecution, withholding, and relief under Convention Against Torture and give the government. Well, we can't do that, as I understand it, because has there been a persecution determination made here? There hasn't been a persecution determination made because the judge relied principally on his adverse credibility. Principally or only. Then if you do send it back, we would ask if he is found credible to take his statements for true and come to the conclusions that naturally come from it and give the government an opportunity to rebut any kind of relocation or change circumstances. I mean, just hypothetically, it wouldn't be inconceivable that the judge could, after we tell him to accept what Singh testified to as true, to accept it as true, he could theoretically find that the persecution was not on account of a protected ground or whatever, you know, something like that. Hypothetically, he could. So we have to give him the next shot at it to reconsider in light of, you know, accepting the testimony as true. To get to the judge, it has to first go through the BIA, so I believe that is the correct decision, yes. Okay. Thank you. Thank you. I'd like to keep the remainder for rebuttal. Sure. Thank you. Good morning, Mr. Duffy. Good morning, Your Honor, and may it please the Court, my name is Edward Duffy and I represent the respondent to the Attorney General, counsel. Your Honor, it's the position of the Attorney General that the BIA's decision in this matter is correct and that the immigration judge properly found that Mr. Singh lacked credibility and therefore denied asylum in this case. First, the first reason given by the immigration judge is the matter of the military militants, Mr. Singh's first encounter with the militants in his hometown. The immigration judge found that story generally implausible, that militants would approach him in the middle of the day armed. Why is that implausible? Your Honor, it was... Because militants don't, in fact, approach people in the middle of the day? Your Honor, it lacks, it absolutely lacks, the story itself lacks any... I want to clarify, I'll let you continue, counsel, but I do want to clarify that when the judge said he found it implausible, he is referring to sort of the truth content of the story itself and not to the demeanor of the witness on the stand. We have no evidence of demeanor here in the record, do we? That's absolutely correct, Your Honor. Okay. So it's strictly to the truth content of the story. In other words, if the story had been written, then the judge still could have, would have looked at it and said this is an implausible story and therefore it's not true. Right. It was not, the immigration judge did not speak at all to the demeanor of the witness in being evasive. So what makes it implausible that militants would appear in a small village in India in the middle of the day? Your Honor, well, it was armed militants in the middle of the day seeking a hot meal, evidently, from the petitioner's testimony, and they forced him to take them back to his house, and they walked down the streets in the middle of the day, and he said that they were armed with what appeared to be weapons. And if you're trying to evade the police, if you're trying to avoid detection, if you're indeed a militant participating in an insurgency against your government... Your Honor, what was the name of the city? Your Honor, I forget the name of the city. Do we know that the police were patrolling in that city? Did the I.J. know that? Your Honor, there's nothing in the evidence to say the police accept that two hours, the petitioner's testimony is that two hours after these people left his house, that the police showed up at his house and arrested him for participating in aiding the militants. He did say, as I recall, that they had their arms hidden, that he happened to see them, but that their arms were hidden. He said they were covered with sheets. Well, sheets was the translation, but I assume it means... I assume they may have been hiding them underneath their garments or had other bases. But that was not the... That in and of itself was not the entire reason for the immigration judge's... It does seem very odd, because we read many transcripts of things that happened in various places. And, you know, in Guatemala and Nicaragua and Central America in the 80s, I mean, there were just militants around. It wouldn't be odd to see them in the middle of the day. Your Honor, it would be odd to see a militant, I think, in the context of what he was speaking. And in the general context of his story in this case, not only with the initial encounter with the militants, but also with his follow-up encounters with the police. He seemed to... Like the second incident at the temple, where his testimony as to what he spoke about at the temple differed from his written statement. I mean, what the immigration judge is looking at is the totality of Petitioner's testimony in the conflicts and finding... And one leads to another. When you look at the totality of what the immigration judge... But what conflicts? This was an implausibility determination. The next one was also an implausibility determination, essentially, that he would – that they came four or five times, and he managed to hide from them each time. He found that implausible. There wasn't a conflict. Well, there was a conflict between his written statement on that. In his written statement to the – that accompanied his asylum application, he stated that they came to his house, and he had to pay bribes to get away from them. Well, you don't think that's not pretty usual language, that if I say to somebody I had to pay for something, it could be my husband who handed the money over? Well, I'm not referring – I'm not referring to – although I was going to refer to that later on. But that is a statement as to who paid the bribe. That's a different issue than what I'm discussing now, Your Honor, but I can discuss who paid the bribe. When he says I paid it, it – his explanation was that, well, members of my family and I paid it, and... No, it was for my money, essentially, or for my joint money. He said it was essentially for my money. For my joint money. For my money. And I can – I can understand that someone would make a statement that way, but that coupled with the fact that he seemed to manage to – first, he said they came to his house and he encountered them. That was in his written statement. In his testimony, he stated that he escaped every time the police came to his house on at least four occasions. But they didn't. He was – he was arrested on several occasions. So he was successful sometimes and unsuccessful at other times. Well, he was arrested – in my understanding, he was arrested after the – after he had fled and got caught later on. Yeah, that was one time, but there was another time in the middle there. Two times at the first village, once when he goes – when he leaves the province. When he leaves the Punjab, he goes to the – gets arrested a third time. And so he has these – he has these instances in which he says, I was able to evade them successfully. And the – and the I.J. says, well, I don't believe you. But the fact of the matter was he wasn't able to evade them successfully. He was arrested three times and tortured three times. Well, he was arrested at the – the three times we're speaking of, the three arrests we're talking about is the one in the middle was the one at the temple where they said they approached him at the temple. And the conflict there, the immigration judge was relying on was that – Well, that was the first one. And there was a second one where they came to his house. I believe the – my recollection, Your Honor, is the first one is one of the militants in the street. The second one is the temple. And I may – I may have them reversed. The third one is in the – in the province. Right. Where he was arrested. And, again, the immigration judge looked at his testimony about that situation and found it implausible that they would arrest him. The whole problem, Counsel, and that's why I began with the question about truth content versus demeanor, is that if we don't have any findings as to demeanor, then all we can do is sort of multiply probabilities. You can say, well, it's implausible because militants would rarely appear during the day. But I don't know what the evidence is for that. I mean, it seems to me that the I.J. can only be sustained if we can – if you can show that militants never appear during the day. And I don't know how you could possibly sustain that. Well, I think if you couple the entire – every reason given by the I.J. and you can isolate each individual reason and pick with it. But if you look at – if you look at the entire decision by the I.J. What you want to do is multiply the – is multiply the probabilities. That is, you say it's rare that militants would appear during the day. It's rare that somebody would be able to escape militants who came by the house or the police who came by the house several times. It's rare. And so we're going to multiply all those things together and say, well, gosh, the probability of this having occurred, then, is very, very rare. But that doesn't prove it didn't happen. Well, it doesn't prove it didn't happen, but it certainly leads to the question of whether the story is implausible in and of itself. And whether – and there are contradictions within his statements and his testimony. And the immigration judge didn't put – I mean, the only ones he relies on is his business bet. I didn't pay it, which is – I think you have conceded pretty weak. And the other one, it seems to me, is similar. Well, there were three. One is what the BIA said about the passport. And they're just wrong about that because he had the passport before any of this  He had the passport in 1992. The passport, and he had renewed it. And I think – I do think it was before any of this happened. In 1992, which is before any of this happened. So it's not at all implausible he was. So they're just wrong about that. That's wrong. And then the next one is this business about Prickton, Preston, and Pierce. And I very – I mean, it seems to me extraordinarily likely that this is a translation issue. That he – the translator seems to have chosen three different words for Prickton, Pierce, and Prest. But he was – seemed to be talking about the same thing all the time. Your Honor, I think there's a difference between his – between – and I don't see it as a translation error. Certainly the court is. But we know that this translator was having problems because he stopped at various times and all that. And here, you know, and he has a doctor's report corroborating this, too. But he had a cut on his leg. Well, I thought it was more specific than that. I mean, in terms of quite consistent with the piercing. It was a punctured wound on his leg. Your Honor, again, the immigration judge looking at a whole at the – Mr. Singh's testimony and multiplying the implausibilities, Judge, made a determination in his story. Well, what I was pointing out, and somewhat going along the same road as Judge Bivey, is, again, that we're back to the implausibilities because the contradictions all go away. So – because I just went through them, and it seems none of them are going to – are sensible. So we're left with these sort of speculative implausibility notions. Your Honor, again, the immigration judge doesn't come to the table as a blank slate. We all bring our – everyone, you know, brings to them their life experiences. Yes, but he doesn't have any life experience in a small town in India with militants walking down the street. He doesn't. Correct, Your Honor. Right. No, and I'm not stating that, but as to what you hear and what you don't hear, you tend to develop a sense of what's true and is not. Mr. Singh didn't testify that aliens came and plucked him up and dropped him at the police station. We would probably agree with you there, but I assume, Mr. Duffy, that being from oil, that you have seen a lot of these Sikh cases, and I know that we have seen many, many of these Sikh cases. And there are elements here, of course, that are common with many of the Khalistan-related Sikh cases that we have seen, which suggests either we've got a common origin, that is, we've got a pattern here, or we've got simple duplication of a once-successful story. But without anything else to confirm this, this sounds very much like patterns that we have seen in other Sikh cases, many of which, I'll say some of which, have been successful. And so it doesn't sound implausible at all. Your Honor, that is, you know, and that is certainly up to debate as to whether it's implausible. These stories are, and as you have seen and as I have seen and as everyone who works in these cases has seen in detail, is that the cases tend to run together. And the question always remains, and in this case, the immigration judge found them implausible. The question always remains in your mind as you do these cases, and I'm sure in the Court's mind as you just stated, that, you know, is this true or is it just the one that the one story that seems to work as it moves on? I'm not accusing anybody of anything. Kagan. But what is true? Roberts. Okay. Why don't you finish your answer. You have one more question, then you're out of your time. Yes. In the run-up cases of this variety, this one, the I.J.'s reasons here seem particularly weak because he doesn't have any clear contradictions. And he is being relegated to his own, you know, assumptions about what would happen and wouldn't happen. So it's unusual in that regard. And he does have lots of documentation, which no one seems to be contesting. That's correct, Your Honor. I mean, the immigration judge. I mean, in other words, implicitly, if he doesn't believe him, he's saying all those documents are frauds, but he never found that. No, he never did. He never did speak to the documentary evidence as to whether there was corroboration to a story or not. Thank you, Mr. Duffy. Thank you. I'll turn it back to you, sir, if you have the last word. Thank you very much. The court is completely correct. You can't base an adverse credibility finding on speculation and conjecture. And the immigration judge over here totally speculated and based his decision on his conjecture and his personal opinions and mindset for objective findings. And there is no substantial evidence to support it. Thank you very much. Thank you, gentlemen. The case just argued is submitted. The first two 20-minute game. Biller and Sear v. Royce, next. Ten minutes. 0656723, Marlowe v. The City of Orange. Each side has ten minutes on this case.
judges: Silverman, Berzon, Bybee